## IN THE UNITED STATES DISTRICT COURT

## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| **v.** | : | **CRIMINAL NO. 19-728** |
| **CRAIG ALEX LEVIN,** | : | |
| a/k/a "Alex Loring," | | |
| a/k/a "Robert Smith" | : | |

## <u>UNITED STATES' SENTENCING MEMORANDUM</u>

### I.      Introduction

The United States requests a sentence of 600 months (50 years) and lifetime supervised release for this defendant who preyed upon hundreds of impoverished young children in the Philippines for the purpose of satisfying his own deviant sexual desires.

### II.      Procedural History

On May 6, 2021, a grand jury sitting in the Eastern District of Pennsylvania returned a 16-count Superseding Indictment against Craig Alex Levin, charging the following criminal violations:

- Foreign Travel to Engage in Sex with a Minor, 18 U.S.C. § 2423(b) (Counts One through Nine);

- Attempted Sex Trafficking of a Minor, 18 U.S.C. §§ 1591 and 1594 (Counts Ten and Eleven);

- Use of an Interstate Commerce Facility to Entice a Minor to Engage in Sexual Activity, 18 U.S.C. § 2422(b) (Count Twelve);

- Distribution of Child Pornography, 18 U.S.C. § 2252(a)(2) (Counts Thirteen and Fourteen);

- Transfer of Obscene Material to a Minor, 18 U.S.C. § 1470 (Count Fifteen); and

- Transportation of Child Pornography, 18 U.S.C. § 2252(a)(1) (Count Sixteen).

The Superseding Indictment was filed after the investigation revealed the defendant's sexual abuse and exploitation of numerous minor girls in the Philippines, including his use of Facebook Messenger to arrange to have sex with minor children in the Philippines, his travel from the United States to the Philippines with a motivating purpose of having commercial sex with minor children, his arranging for a minor to have commercial sex with another United States citizen so that the minor would have the money to repay a debt to him, his distribution of images of minors engaged in sexually explicit conduct and obscene material to a Facebook user who described herself as a 13-year-old-girl, and his transporting a

laptop containing child pornography with him when he traveled from the United States to the Philippines.

On June 29, 2022, the defendant appeared before this Court and pled guilty pursuant to a written plea agreement that he negotiated with the United States that called for his plea of guilty to six of the sixteen counts in the Superseding Indictment:

- Foreign Travel to Engage in Sex with a Minor, in violation of 18 U.S.C. § 2423(b) and (t) (Counts 6 and 9);

- Attempted Sex Trafficking of a Minor, in violation of 18 U.S.C. §§ 1591(a)(l), (b)(2), (c), 1594, and 1596(a)(l) (Count 11);

- Distribution of Child Pornography, in violation of 18 U.S.C. § 2252(a)(2), (b)(l) (Counts 13 and 14); and

- Transportation of Child Pornography, in violation of 18 U.S.C. § 2252(a)(l) and (b) (Count 16)

The charges arose from his travel from the United States to the Philippines on numerous dates with a motivating purpose of having commercial sex with minor children, his arranging for a minor to have commercial sex with another United States citizen so that the minor would have the money to repay a debt to him, his distribution of images of minors engaged in sexually explicit, and his collection of child pornography that he transported with him from the United States to the Philippines.

### III.    Factual Background[1]

Defendant Craig Levin has been traveling to the Philippines since at least 2002, and his Facebook messages suggest he has been doing so for almost the last 40 years, specifically, as early as 1984. In fact, he met both of his ex-wives in the Philippines. Since at least 2014, the defendant has used Facebook Messenger to communicate with minor girls in the Philippines. He connected with girls he had met and those he hoped to meet, and enticed them with promises of money, clothes, phones, and even birthday cake. When the defendant traveled to the Philippines, typically for a month or more at a time, he rented hotel rooms and had minor girls meet him there where he would pay them (about $20) for sex. He also paid other individuals, at least one of whom was a minor, to recruit other minors to have sex with him in the Philippines. The defendant had sexually charged conversations with girls on Facebook and exchanged hundreds of pictures with minor girls, some of which are child pornography. During at least one online conversation with a girl who the defendant believed to be a minor, he transmitted pornographic photographs of minor girls as well as a photograph which he claimed to be his own penis.

Between August 29, 2016, and May 8, 2019, defendant Craig Alex Levin, a United States citizen, traveled from the United States to the Philippines nine times,

---

[1] The factual background is taken from the United States' Change of Plea Memorandum, to which the defendant stipulated prior to the entry of his guilty plea on June 29, 2022. See Guilty Plea Hearing transcript ("GPT") at 27 to 30. The Change of Plea Memorandum totals 29 pages, and excerpts from the Memorandum are recited here, but the full Change of Plea Memorandum is incorporated by reference.

as set forth in the chart below. Each time he did so, commercial sex with minors was a motivating purpose of his travel.

| Count | U.S. Departure Date | Trip Duration |
|-------|--------------------|--------------|
| One | August 29, 2016 | 20 ½ Weeks |
| Two | February 12, 2017 | 4 Weeks |
| Three | July 14, 2017 | 4 Weeks |
| Four | September 18, 2017 | 2 Weeks |
| Five | November 7, 2017 | 4 Weeks |
| Six | February 6, 2018 | 21 ½ Weeks |
| Seven | September 24, 2018 | 6 Weeks |
| Eight | January 27, 2019 | 6 ½ Weeks |
| Nine | May 6, 2019 | Arrested during this trip |

The defendant's purpose in traveling is evident from his social media chats from his Facebook account and from the statements of two of the minor children (Minors 2 and 3) with whom he had sex during his trips to the Philippines. Indeed, Levin's Facebook Messenger records contain thousands of pages of messages between Levin and other users who held themselves out to be minor girls in the Philippines. In these conversations, Levin arranged to meet these girls for sex while in the Philippines. The full set of facts in the United States' Change of Plea Memorandum sets forth multiple excerpts from his Facebook communications, which demonstrate the elements of the offenses with which he is charged, and which also show that his victims were poor and desperate, frequently writing to Levin that they were willing to meet for commercial sex because they were hungry or needed money for medicine for family members.

The defendant also distributed child pornography over the internet to a 13-year-old child. While still in the United States, on April 13, 2019, Levin sent Minor 4 an image of a naked minor female lasciviously exhibiting her genitals through Facebook Messenger. This image was sent after the date on which Minor 4 told him that she was merely 13 years old. The defendant asked Minor 4, "Do u want to see picture of young girl" and then sent her a naked photo of a minor.

| | |
|---|---|
| LEVIN: | do u want to see picture of young girl |
| MINOR 4: | ok hehe |
| LEVIN: | how young |
| MINOR 4: | 12-14 |
| LEVIN: | o.k. |
| MINOR 4: | did u send? |
| (Photo sent) | |
| MINOR 4: | look pornstar hehe |
| LEVIN: | 13 year-old- from Russia |

The photo shows a minor laying back with her legs spread open, the focal point of the photograph being her genital and pubic area. She is naked, has minimal breast development, and lacks any pubic hair. She appears to be approximately 12 or 13, consistent with the defendant's representation. The defendant again sent Minor 4 another child pornography image on April 17, 2019. That photo depicted a

naked minor female who appears to be engaged in a sex act as she is straddling a person lying naked underneath her and she has one hand behind her head. Both the minor and the man appear to be naked and their bodies are touching in the groin area, but their genitals are not visible.

| MINOR 4: | nice pic ..who is that? |
| LEVIN: | I took it from the internet. I think she is 12 or 13. |

On May 24, 2019, the defendant was arrested in the Philippines, about to enter the elevator to his hotel room, with Minor 3, who was 15 years of age at the time. During a search incident to arrest, Philippines National Police (PNP) recovered a fake identification, in a name close to that of Minor 3, on the defendant's person. The identification provided a false date of birth, purporting that Minor 3 was over the age of 18. After his arrest, Philippines National Police executed a search warrant on his hotel room. There they found, inter alia, condoms, lubricating gel, women's underwear, notebooks, and a computer. The notebooks contain the name of hundreds of girls, many of which correspond with Facebook records and most under the age of 18, and a rating system, assigning the girls a number 1 to 10 in each of the following categories: Face, Body, Sex, Personality, and Age. Only girls under 18 received a score of 10 in the "Age" category. A search of a forensic image of the laptop from his hotel room showed that it contained more than 500 images containing child pornography. The defendant had this child pornography on his

computer when he left the United States on May 6, 2019, and when it was found in his hotel room on May 31, 2019.

## IV.   The United States' Recommendation is Reasonable and Necessary to Comply with § 3553(a)

The recommendations of the Sentencing Guidelines are no longer mandatory, but sentencing courts "must consult these Guidelines and take them into account when sentencing." *United States v. Booker*, 543 U.S. 220, 264 (2005).   The Sentencing Guidelines are "the 'starting point and the initial benchmark.'" *Kimbrough v. United States*, 552 U.S. 85, 108 (2007) (quoting *Gall v. United States*, 552 U.S. 38, 49 (2007) (noting that the Guidelines should "be kept in mind throughout the process").   The sentencing court must conduct a two-step process: first calculating the sentence using the advisory Sentencing Guidelines, and then applying an individualized assessment under the statutory sentencing factors set forth in 18 U.S.C. § 3553(a). *United States v. Boulware*, 604 F.3d 832 (4th Cir. 2010).   These factors include:

> (1) the nature and circumstances of the offense and the history and characteristics of the defendant;
>
> (2) the need for the sentence imposed—
>
> > (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
> >
> > (B) to afford adequate deterrence to criminal conduct;
> >
> > (C) to protect the public from further crimes of the defendant.

….

(6) the need to avoid unwarranted sentence disparities among defendants
with similar records who have been found guilty of similar conduct

18 U.S.C. § 3553(a).

Here, the Sentencing Guidelines for Defendant recommend life

imprisonment, but the plea agreement between the parties limits the United States

to advocating for a sentence of no more than 50 years. The United States seeks a

50-year term of imprisonment, lifetime supervised release, and a ban on all contact

with the child victims and any other minor child, both while the defendant is in the

custody of the Bureau of Prisons and while on supervised release.

The plea agreement does not limit or bind the Court.

**A. Nature and Circumstances of the Offense**

Defendant's criminal conduct is extremely serious and demands an

appropriately stringent sentence. He targeted a population that is the most vulnerable

in our global society: children. Even worse, he selected children who were especially

disadvantaged financially in the Philippines. He chose this country because he well

knew that he could abuse and exploit these children in a way that he could never do

in the United States. In other words, of the already most vulnerable humans on the

planet, he chose ones that were in the weakest position to resist him, isolated them

from their family, and then used their bodies to sexually gratify himself. He

manipulated his victims into a situation where they were powerless to resist. He is a

wolf in sheep's clothing, posing as benevolent by offering gifts and money in exchange for children's innocence. He used fear and intimidation, due to his money's power and influence, to keep them from reporting it.

The length of time that the defendant engaged in these crimes also warrants severe punishment. His own records show he has been traveling to the Philippines for the last 40 years, and his notebooks – in which he created a twisted "rating" system of these girls – evidence that he has sexually abused and exploited these children for years, at least as early as 2012.

**B. History & Characteristics of the Defendant**

Many defendants involved in other federal crimes, such as drugs and guns, have dire family life circumstances that lead them to the all-too-predictable path of crime. The defendant in this case experienced the antithesis of that lifestyle. He was raised by both parents who had an "excellent" relationship and who provided for him as a child. PSR ¶ 91. Defendant described his own childhood and adolescence as "excellent" as well. PSR ¶ 93. "At all times, the defendant and his brother were provided with a stable environment with their basic needs (food, clothing, and shelter) met by their parents." PSR ¶ 94. He did not suffer any type of physical, emotional, or sexual abuse during his lifetime. PSR ¶ 94.

For 20 years before he retired, he was gainfully employed as a "special education teacher, coach, and Department Chair" in the Lower Merion School

District, making $95,000 per year. PSR ¶ 114. At the time of his arrest in 2019, he

was supporting himself through his $3,000/month pension.

Defendant has no history of mental illness or psychological disorder. PSR ¶

107. He described his own physical health as "excellent." PSR ¶ 105. Defendant also

has two sons with whom he is still close. PSR ¶ 96. And his only brother is still very

supportive of Defendant, saying "I do not believe that my brother committed this

crime, and we never will," he stated, "I believe my brother is a good man, and he is

supported by us." PSR ¶ 100.

While committing these crimes, he had a supportive family, including adult

children, his brother, and even his ex-wife. He had a comfortable residence, a steady

income, and sufficient financial resources. Yet, he committed these egregious crimes

by deceiving family and those outside the family into believing he was a good guy.

Moreover, he has a good education, including a master's degree in elementary

education. PSR ¶ 74. In other words, he was not lured or coerced through unfortunate

circumstances to this life of crime. Instead, he raced down the path of his own

volition and with full knowledge of what he was doing.  If anything, the history and

characteristics of this defendant militates in favor of increased punishment, not

against it.

Indeed, every individual faces challenges in their life, some more severe, some

less.  But no challenge excuses or mitigates the types of vile offenses committed by

Defendant.  The victims of his crimes—impoverished children within his reach exploited in the worst moments of their lives—are the ones who experience challenges beyond imagination.  On balance, the history and characteristics of Defendant make clear that he has lived a stable life with family support, and had adequate education and financial resources to live a law-abiding life.  He was not corralled into this crime by a series of unfortunate life circumstances.  Rather, he chose his path. His sentence should reflect those facts.

### C. Seriousness of the Offense, Promoting Respect for the Law, Providing Just Punishment

There can be no question that the Defendant's offenses are among the most serious under the law.  As a consequence of being victimized by Defendant, these children are now at an increased risk of falling prey to alcohol abuse, illicit drug use, adolescent pregnancy, and suicide. Research in this area is startling and demonstrates the need for a significant punishment.

In the late 1990s, the Kaiser Permanente San Diego Health Appraisal Clinic, a primary care clinic where more than 50,000 adult members of an HMO receive medical examinations, began a study to examine the long-term relationship between Adverse Childhood Experiences (ACEs) and a variety of health behaviors and health outcomes in adulthood.  First, they took a survey of adults who were members of the Kaiser HMO to determine the number of ACEs experienced.  An ACE was defined to include an experience occurring to the adult before the age of 18 such as verbal

abuse, physical abuse, contact sexual abuse, a battered mother, household substance abuse, household mental illness, incarcerated household members, and parental separation or divorce.  The survey data was collected in 1995 through 1997.

In early 2009, using the National Death Index mortality data, researchers analyzed how many of the 17,337 original survey respondents were deceased 10 years after the survey.  The results were startling. "People with six or more ACEs died nearly 20 years earlier on average than those without ACEs."  David W. Brown, et al, *Adverse Childhood Experiences and the Risk of Premature Mortality*, 37 American Journal of Preventive Medicine 389-96 (2009).  In other words, if a person in the control group lived to 79.1 years old, that same person will only live to age 60.6 years old if she experienced six or more ACEs before the age of 18.

While it is certainly alarming to know that serious negative experiences in childhood could be correlated with such a precipitous drop in life expectancy, the ACE Study expressly observed that "[t]here are several reasons to believe that these estimates of the relationship between ACEs and premature death are *conservative*." (*Id*. at 394 (emphasis added).)  Indeed, when the initial survey was conducted in 1995 to 1997, approximately 60% of the survey respondents were already 50 years or older. Given that fact, "it is reasonable to postulate that people who are exposed to ACEs (particularly multiple ACEs) are more likely (compared to those who are unexposed) to be aborted; die during childhood or young adulthood; be

institutionalized; or be otherwise lost prior to the initiation of the ACE Study." (*Id.* at 394-95.) In other words, the ones who lived long enough and thrived well enough to be available for the HMO study were the most resilient of those who had experienced 6 or more ACEs; yet even that resilient group experienced a premature mortality of 20 years. In addition, the survey respondents were of a population who were enrolled in a major health plan at that time, i.e., "predominantly white, middle-class adults." (*Id.* at 394.)  Due to these facts about the survey population, "the association between ACEs and premature all-cause mortality would be biased downward." (*Id.* at 395.)  In other words, it is reasonable to conclude that an ACE victim's risk of premature mortality is even greater than the ACE Study results show. That is especially so for Defendant's victims who are raised in a country where 18% of the population live below the poverty line. *See*

https://databankfiles.worldbank.org/public/ddpext_download/poverty/987B9C90-CB9F-4D93-AE8C-750588BF00QA/current/Global_POVEQ_PHL.pdf

(last accessed March 1, 2023). Indeed, the mortality rate for females in the Philippines is 6 years younger than in the United States (74 vs. 80). *See*

https://data.worldbank.org/indicator/SP.DYN.LE00.FE.IN?locations=PH

(last accessed March 1, 2023).

Additional research using the same survey data has drilled deeper to better understand the relationship between the severity of the childhood *sexual* abuse (not

just adverse childhood experiences) and the long-term health and social problems. *See* Shanta R. Dube, et al, *Long-Term Consequences of Childhood Sexual Abuse by Gender of Victim*, 28 American Journal of Preventive Medicine 430-38 (2005). First, the study bifurcated the population of sexual abuse victims by classifying them into "sexual abuse, no intercourse" and "intercourse." Intercourse was defined as answering yes to the question of whether any "adult, relative, family friend, or stranger ever" attempted or actually had "any type of sexual intercourse with you (oral, anal, or vaginal)."

Using those definitions and categories, the study showed that adult women who were sexually abused in the form of intercourse as a child, were 360% more likely to attempt suicide than women who had never been sexually abused as a child. (*Id*. at 432, Table 4.)  Equally unsettling was that even the children who experienced non-intercourse sexual abuse (so-called "just fondling") were **80% more likely** to attempt suicide than those who had never been sexually abused. Sadly, this data set does not (because it cannot) include actual suicides, which undoubtedly would increase the odds described in the study.

In addition to suicide risk, non-intercourse female child sexual abuse victims were 60% more likely to use illicit drugs ("street" drugs, e.g., meth, heroin, cocaine), and 50% more likely to have alcohol problems. Even worse, intercourse victims were 90% more likely to have these problems. (*Id*.)

Yet another analysis of the same data looked at whether exposure to ACEs increased the risk of adolescent pregnancy and fetal death. *See* Susan D. Hillis, et al, *The Association Between Adverse Childhood Experiences and Adolescent Pregnancy, Long-Term Psychosocial Consequences, and Fetal Death*, 113 Pediatrics 320-27 (2004). Compared with women who did not report any ACEs, there was a 60% increased risk in adolescent pregnancy for those who experienced childhood sexual abuse. (*Id*. at 322.) More disturbingly, "a strong and independent trend was observed for the association between ACE score and **fetal death** as the outcome of the first pregnancy." (*Id*. at 323.) In other words, even an ACE score of 1 resulted in a 7.6% increased risk in that woman's first pregnancy resulting in fetal death, and 10.2% increased risk for 5 or more ACEs. (*Id*.) That is, "[a]s the ACE score rose in these younger women, the risk of fetal death as the outcome of the first pregnancy increased." (*Id*. at 323-24.) In sum, "the cumulative and chronic exposure to stress associated with ACEs during childhood led to an increased risk of nonviability for the infant, persisting through both the first and second pregnancies." (*Id*. at 325.) Below is a chart summarizing the increased health risks to people like the victims in this case:

| | |
|---|---|
| Years of life lost | 18.5 |
| Increased risk of attempted suicide | 80% |
| Increased risk of using street drugs, e.g., meth, heroin, cocaine | 60% |
| Increased risk of adolescent pregnancy | 60% |

| | |
|---|---|
| Increased risk in first pregnancy resulting in fetal death | 7.6% |

Section 3553(a)(2)(A) instructs this Court to fashion a sentence "to reflect the seriousness of the offense, to promote respect for the law, and to provide *just punishment* for the offense." (emphasis added).  The scientific research interpreting the ACE Study very clearly demonstrate the profound long-term consequences of various kinds of adverse childhood experiences, especially childhood sexual abuse. For Defendant's victims, who were exploited by him, they now have a significantly increased risk of attempting suicide, using illicit drugs, and having alcohol problems. In addition, they are at substantially greater risk of getting pregnant as an adolescent, and, independent of when they get pregnant, they are far more likely to have their first or second pregnancy end in the death of their baby before birth.  Finally, there is an increased chance that they will die <u>nearly 20 years early</u>.  In short, by using these victims as sexual objects for his own base gratification, Defendant has forever impacted their lives in ways that have significant long-term health consequences.

Defendant robbed these girls of their innocence.  There is no telling what damage he has ultimately caused, and whether they will ever be able to live productive, healthy lives.  A significant sentence of imprisonment would therefore be both reasonable and appropriate—"just punishment" in the terms of § 3553(a)— given the lifelong consequences that these victims will likely experience due to Defendant's reprehensible acts.

17

### D. Adequate Deterrence & Protect the Public

Both specific and general deterrence call for significant sentences above the mandatory minimum to send a message that engaging in repeated sexual abuse of children that causes extensive harm, will result in a federal prison term that takes one far into old age, if not an effective life sentence.   A long sentence is also necessary to minimize the risk of harm to the public lest this Defendant return to society at an age where his physical functioning and predilections enable continued inappropriate sexual behavior.   Indeed, if the best predictor of sexual recidivism is the age of the defendant (the younger upon release, the more likely to commit a new sexual crime), then the corollary is also true: The longer they remain in prison, the older they will be upon release, and thus the less likely they will be to commit a new sexual crime.

The risk Defendant poses to children is immense.   Thus, the public has a right to be protected from this defendant who has demonstrated an unequivocal desire to engage in sexual activity with children as young as 12-years-old.

To the extent Defendant argues that a sentence near the minimum would be "sufficient, but not greater than necessary" because such sentence would take him into his late 70s, the reality is that even if Defendant were imprisoned long enough that he would be *less likely* to commit sexual assaults on children, scholarly research

in this area demonstrates that sexual predators like Defendant will simply change

their *modus operandus*:

> Generally, older sex offenders engage in more passive sexual activity
> as compared to their younger counterparts. For example, fondling by
> elderly offenders is more prevalent than intercourse. Research has
> shown that elder offenders are more likely to commit 'nonviolent'
> sexual offenses such as pedophilia or exhibitionism as opposed to
> 'violent' offenses such as forcible rape. Specific examples of these
> 'nonviolent' offenses include improperly touching an acquaintance,
> statutory rape, exposing of the genitals (usually to a minor), and other
> acts of exhibitionism.

Matt Hart, *The Geriatric Sex Offender: Senile or Pedophile?*, 32 Law & Psychol.

Rev. 153 (2008).  Indeed, a simple Google search reveals numerous news reports of

older individuals committing sex crimes against children.

- 79-year-old "Gainesville man charged with child molestation" - https://www.dawsonnews.com/news/crime-courts/gainesville-man-charged-child-molestation/
- "79-year-old York man who put his child victims through 'terrible sexual abuse'" - https://yorkmix.com/jailed-79-year-old-york-man-who-put-his-child-victims-through-terrible-sexual-abuse/
- 78-year-old "Cherokee County, N.C. [man] charged with sexually assaulting children" - https://wlos.com/news/local/cherokee-county-nc-men-charged-with-sexually-assaulting-children

Moreover, there are dozens of examples of defendants over the age of 60 who have

been sentenced in federal court for the production of child pornography, which is

effectively the federal equivalent of a contact sex offense, and the most common

charge for a contact offender in federal court.  Gordon Elton Hayes was 60 years old

when he produced child pornography of three minor victims in Alabama.  *United*

*States v. Hayes*, 4:07-cr-62 (N.D. Al.) (sentenced to 3,720 months). Benton Stong was 74 years old at the time he produced child pornography involving 10- to 12-year-old victims in Iowa. *United States v. Stong*, 6:13-cr-214 (N.D. Ia.) (sentenced to 1,320 months).

Furthermore, there are also plenty of examples of older defendants who re-offended even after serving prison sentences. Jerry Lee Hendricks was 66 years old when he was convicted of producing child pornography of one victim in Illinois after previously being convicted in South Carolina (Chesterfield County and Darlington County) of "Lewd acts on a child under 16" when he was 56 years old. *See United States v. Hendricks*, 12-CR-20025 (C.D. Ill. June 26, 2014). Other examples abound. *See United States v. McGee*, 10-CR-162, Doc. No. 71 (S.D. Ala. Mar. 3, 2011) (62-year-old defendant sentenced to life for production of child pornography following prior sex conviction); *United States v. Pavulak*, 09-CR-43, Doc. Nos. 1, 120, 121 (D. Del. Oct. 14, 2011) (67-year-old defendant sentenced to life for production of child pornography following prior sex conviction).

The bottom line is that people are living longer, the quality of health care in the Bureau of Prisons is better than some inmates would receive outside of prison, and the sexual attraction to children is a life-long problem that will not magically go away at a certain advanced age. Accordingly, attempts to speculate into the future about this Defendant's physical abilities to act on his life-long desire to have

sex with children when he is in his 70s or 80s are just that: Speculation. Absent additional information about this defendant's actual health situation at that time, this Court cannot (and should not) adjust its sentence based upon the arbitrary assertion that people in their 70s or 80s are less likely to offend against children.

### E.  Need to Avoid Unwarranted Sentencing Disparities

This Court has no doubt encountered cases involving the sexual exploitation of children.  The facts of this case, however, are remarkable in their depravity. Defendant manipulated the children (and their parents in some instances) so that he could isolate them away from their parents in a hotel room where he gave them cheap gifts and small amounts of money to persuade them to do what they otherwise would never have done voluntarily: engage in sexual acts with Defendant. He executed his plan after obvious planning. It was utterly diabolical.

There are examples of similar cases across the country in which the defendant received a sentence similar to (or more severe than) that being requested by the United States in this case. In the most similar case, *United States v. Day*, 8:19-cr-354 (M.D. Fl.), the defendant, between 2014 and 2017, communicated on Facebook with over 30 minor boys located in Vietnam. These communications included countless requests by the defendant to engage in sex acts with these boys, including oral sex. Some of the defendant's communications also included requests for the minor boys to send the defendant pornographic images of themselves, some of

whom complied. Consistently throughout these communications, the defendant would ask these boys how old they were, and all of the boys responded that they were various ages, between 12 and 18 years.

Also between 2014 and 2017, the defendant traveled back and forth between Florida and Vietnam, to engage in sex acts with minor boys. In exchange for sex acts, the defendant promised the boys small amounts of Vietnamese currency and sometimes even American merchandise, such as shoes and hats. (*See* United States' Sentencing Memorandum, Doc. No. 120). The defendant, Christopher Day, pled guilty to two counts of 18 U.S.C. § 2423(b) (travel with intent to engage in illicit sexual activity) and two counts of 18 U.S.C. § 2422(b) (attempted enticement of a minor to engage in sexual activity). The defendant did not have any prior criminal history. The court sentenced him to life imprisonment.

The similarities between the *Day* case and the Levin matter are clear and obvious. Both defendants utilized Facebook to communicate and entice their victims while the defendants were in the United States and the victims were in their respective impoverished country. Both defendants repeatedly traveled from the United States to the foreign country over the course of several years. Both defendants engaged in sexual activity with children as young as 12 years old. Both defendants engaged in sexual activity with dozens of children. There is no meaningful

22

difference between these defendants, except that Levin victimized significantly more children than did Day.

In another remarkably similar case, *United States v. Edward Sanchez*, 19-cr-00850 (SDTX), the defendant frequently traveled to the Philippines to engage in illicit sexual conduct with several children ages 12-15. Like Levin, he sent them money because they "needed powdered soap for laundry, food, medicine for themselves or their sick relatives, shoes for their training in their respective athletic disciplines, and teddy bears." (*See* United States' Pretrial Memorandum, Doc. No. 74.) When he was in the Philippines, he would take these children, "from impoverished backgrounds, to the cinema, the mall, and to local restaurants and ice cream parlors." (*Id*.) Sanchez went to trial and was convicted. The court sentenced him to life in prison. There is also no meaningful difference between this defendant and Levin, again except for the significantly larger volume of victims attributable to Levin.

In *United States v. Earl G. Rice, Jr.*, 19-CR-30167 (SDIL), the 59-year-old defendant engaged in online communications with a 13-year-old girl in a neighboring state, and then traveled there to engage in sexual conduct with the child on one occasion. The defendant did not have any prior sex convictions. The United States requested a sentence of 40 years, but the Court went above that recommendation, and sentenced the defendant to 50 years in prison.

In *United States v. Thomas John Boukamp*, 20-CR-100 (NDTX), the defendant, from his home in Michigan, engaged in online communications with a 14-year-old girl in Texas, traveled to Texas and then transported the girl back to Michigan where he engaged in sexual conduct with her. This defendant went to trial, and the court sentenced him to life in prison.

Defendant Levin's conduct is arguably worse than all of the cases listed above simply by virtue of the volume of victims in Levin's wake. Additionally, he kept detailed records of his *hundreds* of victims. Using a 10-point scale, he scored his victims according to five categories: Face, Body, Sex, Personality, Age. A thorough review of his scoring system makes it clear that any person who was 18 would receive a score below 10 in the Age category. Likewise, any child under the age of 18 would receive a 10 in the Age category. That fact alone shows his paraphilic disorder of sexual interest in children. As the excerpt from his notebooks below makes clear, he noted the age of the girls, including two who were 12-years-old, one who was 13, and another who was 14.

As the above cases make clear, the United States' request, along with Probation's recommendation, is commensurate with similar cases from different jurisdictions—from Texas to Illinois to Florida—where very similarly situated defendants were sentenced for similar conduct.  Therefore, a sentence of 50 years would not result in a sentencing disparity.

Likewise, there are multiple examples of cases from this District in which significant sentences were imposed for conduct that is arguably less egregious than Levin's. For example, in *United States v. Maffei* (Crim. No. 16-511), Judge Goldberg sentenced the defendant to 90 years (statutory maximum) plus lifetime supervised release for his sexual abuse of a 9-year-old girl over a one-week period during which he videotaped the abuse. Defendant Levin's criminal conduct far exceeds that of the abuse of one child over a one-week period; indeed, Levin repeatedly abused

hundreds of victims over the course of many years. Below are other examples from this District:

- *United States v. Bristol* (Crim. No. 18-375, J. Pappert) – 360 months imprisonment; Lifetime supervised release. Defendant was 62 years of age at time of sentencing, had corresponded with girls in the Philippines, and purchased sex shows in which children were sexually abused at his direction. He then attempted to travel (as he had done many times before) to the Philippines to have sex with two girls in particular but was arrested as he tried to board the plane.

- *United States v. Perez-Colon* (Crim. No. 18-108, J. Pratter) – 660 months imprisonment. Defendant abused 2-year-old on one occasion and distributed images over the internet.

- *United States v. Gonzalez* (Crim. No. 18-305, J. Beetlestone) – 400 months imprisonment. Defendant sexually abused his victims as part of his production of CSAM crimes.

- *United States v. Moury* (Crim. No. 21-433, J. McHugh) – 420 months imprisonment. Defendant abused his victim as part of his production of CSAM crimes.

- *United States v. Norman* (Crim. No. 19-179, J. Bartle) – 336 months imprisonment. Defendant corresponded online with two underage girls and had them self-produce CSAM.

- *United States v. Paolini* (Crim. No. 19-162, J. Quinones-Alexandro) – 360 months imprisonment. Defendant was in her 50s at time of commission of offense, in which she victimized teenaged boys online and had them self-produce CSAM.

**F. Counts Should Run Consecutively**

U.S.S.G. § 5G1.2(d) provides that counts should run consecutively if the statutory maximum of the highest count is less than the total punishment. Here, Defendant scored a Level 47 on the Guidelines, which is well beyond the end of the table's capacity that ends at Level 43. Anything 43 or higher calls for a recommended life sentence. Because the highest statutory maximum is 30 years for Counts 6 and 9, and 20 years for Counts 13, 14 and 16, this Court should run enough of the counts consecutively to ensure that Defendant spends 50 years in prison. *See United States v. Bailes*, 665 F. App'x 340, 343 (5th Cir. 2016) (affirming 1,620-month sentence in child pornography production, distribution, receipt, and possession case where court ran counts consecutive pursuant to § 5G1.2(d)); *United States v. Fruge*, 451 F. App'x 434, 437 (5th Cir. 2011) (affirming 720-month sentence in child pornography production case where

defendant pled guilty to two counts and court ran both counts consecutive, pursuant to § 5G1.2(d), to achieve Guidelines recommendation of Life); *United States v. Slaydon*, 360 F. App'x 538, 540 (5th Cir. 2010) (affirming court's imposition of consecutive sentences on possession and production of child pornography counts, pursuant to § 5G1.2(d)); *see also United States v. Sarras*, 575 F.3d 1191, 1209 (11th Cir. 2009) (affirming 1200-month sentence in child pornography production case where Guidelines called for Life, but statutory maximum was 30-years, so court stacked counts pursuant to § 5G1.2(d)).

## V. Lifetime supervised release is reasonable and appropriate

Regardless of the term of imprisonment, this Court should impose a term of supervised release that extends for the life of the defendant. "Supervised release fulfills rehabilitative ends, distinct from those served by incarceration." *United States v. Johnson*, 529 U.S. 53, 59 (2000). Supervised release is not a punishment in lieu of incarceration. *See United States v. Granderson*, 511 U.S. 39, 50 (1994). If being on supervised release were the punitive equivalent of being in prison, and if it served the just desserts function, there would be no need to put most criminals in prison. *See United States v. Irey*, 612 F.3d 1160, 1210 (11th Cir. 2010). The life term recommendation contained in Section 5D1.2(b) is evidence that recidivism rates for sex offenders do not appreciably decline as offenders age. *See* H.R. Rep. No. 107-527, at 2 (2002) (discussing the merits of a life term of supervised release

for sexual offenders); *see also supra* (discussing defendants over the age of 60 who have committed similar federal child exploitation crimes). Because, in sex crimes cases, there is no reason to believe that the need for supervision inherently decreases with time, Congress found lifetime supervised release to be appropriate, and thus directly inserted such a recommendation into the Guidelines. *See id*. More specifically, the passage of 18 U.S.C. § 3583(k) recognized the long-standing concerns of federal judges and prosecutors regarding the inadequacy of the existing supervision periods for sex offenders, particularly for the perpetrators of child sexual abuse crimes, whose criminal conduct may reflect deep-seated aberrant sexual disorders that are not likely to disappear within a few years of release from prison. Many of these offenders need long term or lifetime monitoring and oversight. *See* H.R. Conf. Rep. No. 108-66, at 49-50 (2003), *reprinted in* 2003 U.S.C.C.A.N. 683, 684. A term of supervised release for life is reasonable and appropriate in this case to achieve rehabilitative ends and to protect children from further victimization.

## VI.   Conclusion

This Court has the opportunity to bring security to the community—here in eastern Pennsylvania, in the larger community of America, and, most especially, to the community of the Philippines where Defendant was intending to live the rest of his life—by ensuring that children do not have to worry about being targeted by a predator such as Defendant for a very long time. This Court also has the opportunity

to provide the victims in this case with a chance at peace and closure by imposing a total punishment of 50 years (600 months) so that the Defendant may never harm them or any other American or Filipino children again.

The evidence shows that Defendant engaged in this depraved sexual abuse of children for years.  But in doing so, he gave these victims a lifetime of trauma and hardship.  Forevermore, these victims will have to face embarrassing, stressful, awful conversations with their families, friends, people they date, and maybe someday, their own kids. It is one of the burdens that Defendant saddled these victims with for the rest of their lives.  Their victimization is an albatross of anxiety that cannot be buried, but instead must be shouldered by these victims until they are each laid to eternal rest.  Their lives are forever changed in the most profound ways. And this Defendant's life should be changed as well: By spending the next 50 years of his life behind bars, just as the victims will suffer a lifetime of emotional and psychological imprisonment for the sexual crimes he committed against them.

Respectfully submitted,

JACQUELINE C. ROMERO
United States Attorney

 /s Michelle Rotella
MICHELLE ROTELLA
Assistant United States Attorney
Project Safe Childhood Coordinator

 /s Austin M. Berry
AUSTIN M. BERRY

Trial Attorney
Child Exploitation & Obscenity Section
Criminal Division, Department of Justice
1301 New York Avenue, NW
11th Floor
Washington, DC 20005
Email: Austin.Berry2@usdoj.gov

Date: March 6, 2023.

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this day I caused a true and correct copy of the

United States' Sentencing Memorandum to be filed electronically on the Electronic

Case Filing System and is available for viewing and downloading from the ECF

system, and is also being served by electronic mail on the following defense

counsel:

John J. McMahon, Jr., Esquire
mcmahonlaw@hotmail.com

/s Austin M. Berry
AUSTIN M. BERRY
Trial Attorney

Date: March 6, 2023.